**RED LAKE BAND OF CHIPPEWA INDIANS, et al., Appellees,**

v.

**UNITED STATES of America, Appellant.**

**RED LAKE BAND OF CHIPPEWA INDIANS, et al., Appellants,**

v.

**UNITED STATES of America, Appellee.**

**Nos. 90–5145, 90–5157.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 20, 1991.

Decided June 28, 1991.

John C. Martin, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., were on the brief, Washington, D.C., for appellant in No. 90–5145 and appellee in No. 90–5157.

Harry R. Sachse, for appellees in No. 90–5145 and cross-appellants in No. 90–5157. Kay L. Richman, also entered an appearance, Washington, D.C., for Red Lake Band of Chippewa Indians, et al.

Before WILLIAMS, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

HENDERSON, Circuit Judge:

The appellees, the Red Lake Band of Chippewa Indians ("Band") and certain of its members, brought this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, ("FTCA") seeking damages resulting from the government's negligent failure to contain an uprising by dissident members of the Band. Initially, the district court granted summary judgment in the government's favor, finding no negligence as a matter of law. In *Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187 (D.C.Cir.1986) ("*Red Lake I*"), we vacated that judgment in part and remanded for trial of the remaining issues. Following remand, the court held a bifurcated trial on the merits, first finding the government liable for negligence, then awarding the appellees damages totalling $849,562.62. The government has appealed the damage award and the appellees have filed a cross-appeal seeking additional damages that the district court declined to award. We conclude that the appellee's damages were not proximately caused by the government's negligence and therefore reverse the district court's judgment.

I.

The district court's findings reveal the following facts, supported by the evidence and largely undisputed.

In May 1979, when the relevant events occurred, the Bureau of Indian Affairs ("BIA") was charged with law enforcement responsibility for the Red Lake Reservation in northwestern Minnesota and, for that purpose, maintained a police force on the reservation under the command of Officer Robert W. McMullen. On May 18, 1979, a tribal judge warned McMullen of a possible disturbance on the reservation the weekend of May 19, 1979, because of the recent firing of Stephanie Hanson, the band treasurer. In response, McMullen assigned

two additional officers to reservation duty for the weekend.

In the early morning of May 19, 1979, five armed male members of the Band, led by Harry Hanson, husband of the fired treasurer, launched a rebellion against the Band's chairman, appellee Robert Jourdain. The dissident Band members occupied the Red Lake Law Enforcement Center ("LEC") and took five police officers and jailers hostage. Five other officers escaped from the LEC to a nearby garage and two of them called McMullen to notify him of the take-over. McMullen in turn called the Beltrami County Sheriff's office to request assistance and to ask that the FBI be informed of the situation. McMullen then set up headquarters at the "Mission" building located near the LEC.

At approximately 9:00 a.m., fifteen local police officers, led by Bemidji, Minnesota Police Chief David Simondet and Beltrami County Sheriff Tom Tolman, arrived at the reservation in response to McMullen's call for assistance.[1] The reinforcements split into two groups: one, led by Tolman, entered the reservation from the east, while the second, led by Simondet, entered from the west.

Tolman joined McMullen at the Mission and the two men decided to set up police checkpoints at key intersections on the reservation in order to confine the disturbance to the area surrounding the LEC, to prevent other Band members from participating and to maintain surveillance. Accordingly, checkpoints were set in place between 9:00 and 9:30 a.m. and the officers assigned to them were instructed to allow people to leave the LEC area but to prevent persons from entering, particularly those transporting firearms, ammunition, food or alcohol. McMullen and Tolman left the Mission around 10:15 a.m. and shortly before 11:00 a.m. moved into the BIA Building. In the interim, at about 10:30 a.m.,

the dissidents set fire to a police garage near the LEC.

In the course of that morning five FBI agents, including Special Agent Robert Erwin, were sent to the reservation to investigate the disturbance. At about 11:00 a.m. Erwin, without attempting to contact McMullen or Tolman, directed Bemidji Police Chief Simondet to radio all law enforcement officers to withdraw from their positions and meet him at a specified intersection. From there, Erwin directed them to withdraw to a second location, off the reservation, where they were later joined by McMullen and Tolman. At about 1:30 p.m., Erwin announced that the FBI would not be returning to the reservation.

Meanwhile, at approximately 12:00 noon, the dissidents set fire to the LEC.[2] The uprising then moved into the commercial area of the reservation and looting soon began. Around 2:30 p.m. the BIA and local officers reentered the reservation and set up headquarters in the BIA building, hoping to protect government and tribal buildings in the area. At about 4:00 p.m., "with things now generally out of control," the police forces left the reservation to await reinforcement. Between 7:00 and 7:30 p.m., they returned to the reservation, reinforced, and were able to protect its eastern side; the western side, however, was then under the dissidents' control and suffered extensive destruction and looting during the night.

On Sunday, May 20, 1979, negotiations commenced between the dissidents and the government and an agreement was reached the following day.

## II.

In late 1981, the Band and individual Band members Roger Jourdain, Francis Brun and Elaine Johnson commenced this action seeking damages for injuries alleg-

---

1. The BIA participated in the "Northwest Minnesota Law Enforcement Task Force," a regional association of law enforcement agencies that provided assistance to each other during crises. The Beltrami County Sheriff's Department and the Bemidji Police Department were also participants in the task force.

2. Shortly after the fire broke out, an off-duty BIA officer freed the hostages from the cell where they were confined.

edly caused by the BIA's and Erwin's negligent failure to contain the uprising. The Band sought damages for loss of use of the LEC, destruction of buildings and property, disruption of programs and costs incurred relocating officers and offices. The individual appellees sought compensation for houses and property destroyed during the nocturnal looting of May 19, 1979.[3]

By order dated April 18, 1985, the district court granted the government's motion for summary judgment. The court rejected the government's contention that the alleged negligence fell within the discretionary function exception to the FTCA[4] but concluded that on the undisputed facts there was no actionable negligence as a matter of law. On appeal, we affirmed the district court's judgment in part, finding the government immune under the discretionary function exception from liability for the claimed negligence of the BIA. We vacated the judgment, however, insofar as it applied to Erwin's alleged negligence, concluding that his actions fell outside the scope of that exception and that the facts, when viewed in the light most favorable to the Band, were susceptible of the inference that he had acted negligently. Accordingly, we remanded for trial of Erwin's alleged negligence.

On remand, the Court conducted a bifurcated trial on the merits, first trying the question of liability. In "Findings of Fact and Conclusions of Law," filed August 5, 1988, the court concluded the government was liable to the appellees on account of Erwin's negligence. The court identified the following specific negligence by Erwin:

68. The court finds that Agent Erwin's failure to coordinate his efforts with those of the other officers on the scene, including the failure to keep them informed of his whereabouts and other vital information, was a violation of FBI practice, of nationally-accepted law enforcement standards, and of the duty of reasonable care owed to the plaintiffs.

69. Agent Erwin's failure to establish a command post was a violation of FBI practice and of the duty of reasonable care owed to the plaintiffs.

70. Agent Erwin had no authority to issue orders to non-FBI law enforcement officers. His decision to withdraw all of the officers from the Reservation, without having contacted the officer in charge of those officers, and without knowledge of the whereabouts of the officers, plans for containment or expected reinforcements was a violation of FBI practice, and was negligent because a reasonable FBI agent in similar circumstances would not have so acted.

JA 107–08. The court further found that Erwin's negligent acts were "the actual and proximate causes of the damages suffered by the plaintiffs." JA 108.

The court heard testimony on damages in June 1989 and in a memorandum opinion filed March 22, 1990, awarded damages to the Band of $689,274.62,[5] to Jourdain of $103,738, to Johnson of $2,050.00 and to Brun of $54,500. The court rejected the appellees' claims for other damages, finding them either unrecoverable as a matter of law, insufficiently proved at trial or not the result of Erwin's negligent conduct.

The government now appeals the district court's judgment on three grounds: (1) the appellees' damages were not proximately caused by Erwin's negligence; (2) the ap-

3. The property destroyed included an office building, warehouse, bus and artifacts belonging to the Band as well as Roger Jourdain's house, garage and automobile, Francis Brun's house and laundromat and Elaine Johnson's automobile.

4. Under the discretionary function exception the government retains sovereign immunity from liability on

[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

5. This award reflects $562,700 for loss of use of the LEC for eight years, $76,768 for the office building and its contents, $10,000 for the warehouse, $10,000 for the bus, $9,306.62 for living expense reimbursement the Band paid Jourdain for three months following the disturbance and $20,500 for war bonnets kept at Jourdain's home.

pellees are barred from recovering any damages under Minnesota's public duty doctrine; and (3) the Band is not entitled to damages for loss of use of the LEC. The appellees have cross-appealed contending the trial court erred in failing to find the BIA negligent and in declining to award many of the damages sought at trial. We conclude the district court committed no error in not finding the BIA negligent. We further conclude there was insufficient evidence to find the appellees' damages were proximately caused by Erwin's negligence and therefore reverse the district court's judgment on that ground. In reaching these conclusions, we address the negligence and causation questions separately.[6]

### III.

First, we consider the appellees' claim that the trial court erred in not finding the BIA negligent for failing to secure the LEC by keeping its doors locked and maintaining alert officers on duty. In *Red Lake I*, we stated: "[I]n this case, we do not believe that the precautionary measures taken by law enforcement officers in response to rumors of impending trouble could, even if negligent, serve as the basis of a claim under the Federal Tort Claims Act." 800 F.2d at 1198. We reasoned that "the decisions on the extent of contingency planning made by the BIA" were within the scope of the discretionary exception to the FTCA and that "consequently the allegations that those determinations were negligently made or executed must be dismissed." *Id.* Thus, our decision in *Red Lake I* makes it clear that the discretionary function exception protects the government from liability for the BIA's failure to secure the LEC as a precautionary measure in response to the tribal judge's warning. Nevertheless, the appellees now assert that, the warning aside, the BIA was negligent in failing to carry out "[t]he simple day-to-day implementation of well-established principles of police safety—locking

doors and remaining alert,"[7] which lapse, they contend, constituted "ordinary operational negligence"[8] outside the scope of the discretionary function exception and, consequently, of our decision in *Red Lake I.* We find this argument unavailing.

■ In the August 5, 1988, order the district court determined that it was precluded under *Red Lake I* from considering allegations of the BIA's negligence, noting that we had expressly directed that "[t]he allegations of negligence at issue will be those that relate to the actions we have held to be outside the scope of the discretionary function exception." J.A. 109 n. 2 (quoting 800 F.2d at 1201). We agree. The appellees cannot now rely on the BIA's failure to secure the LEC, having failed to allege such negligence with any degree of specificity or clarity in their complaint or in the summary judgment proceedings or appeal therefrom. *See generally Red Lake I; see also* JA 335–36. Accordingly, we affirm the district court's rejection of the claim of negligent failure to secure the LEC.

### IV.

Next, we consider the question of causation. In the March 22, 1990, order, the district court expressly found that "defendant's negligence, specifically Agent Erwin's order to all police officers to withdraw from the Red Lake Reservation May 19, was a material element and substantial factor in bringing about" the injuries for which damages were awarded and was therefore the "cause in fact" of those injuries. Under rule 52(a) of the Federal Rules of Civil Procedure, the court's findings of causation can be set aside only if "clearly erroneous," that is, if they are without substantial evidentiary support or were induced by erroneous application of the law. *Cuddy v. Carmen,* 762 F.2d 119, 124 (D.C. Cir.1985) (quoting *Case v. Morrisette,* 475 F.2d 1300, 1307 (D.C.Cir.1973)), *cert. de-*

---

**6.** In light of our resolution of these issues, it is not necessary to address the remaining arguments raised by the parties and we decline to do so.

**7.** Amended Brief for Appellees/Cross Appellants at 27.

**8.** *See* Cross Appellants' Reply Brief at 2–3.

*nied,* 474 U.S. 1034, 106 S.Ct. 597, 88 L.Ed.2d 576 (1985). Because we conclude the record is without substantial evidence that Erwin's negligence proximately caused the appellees' damages, we conclude that the court's findings on causation are clearly erroneous and that the damage award must therefore be reversed.

 Causation under the FTCA is governed by *lex loci delicti,* here, the law of Minnesota. 28 U.S.C. § 1346(b) (providing for liability "in accordance with the law of the place where the act or omission occurred"); *Parada v. United States,* 420 F.2d 493, 495 (5th Cir.1970) ("the question of whether the Government's negligence ... was a proximate cause of the damage suffered by appellants is a question of Texas law since Texas is the place of the wrong"); *see also Red Lake I,* 800 F.2d at 1192 ("Minnesota law ... governs the merits of this case"). In an action for negligence under Minnesota law, the plaintiff bears the burden of proving that the defendant breached a duty to the plaintiff and that the breach was "the actual and proximate cause" of· injury to the plaintiff. *Marlow v. Columbia Heights,* 284 N.W.2d 389, 392 (Minn.1979); *Zinnel v. Berghuis Constr. Co.,* 274 N.W.2d 495, 498–99 (Minn. 1979). In determining causation, the Minnesota courts apply a "but for" test under which a defendant's negligence is said to have proximately caused a plaintiff's injury if but for that negligence the injury would not have occurred. *Betz v. Nelson,* 367 N.W.2d 922, 925 (Minn.App. 1985). All of the damages at issue here resulted from either the burning of the LED or the looting and destruction that occurred the following night.[9] Thus, the dispositive question is whether but for Erwin's negligent withdrawal of police personnel the burning and looting might have been avoided. We conclude that they would not.

To support the district court's finding of causation, the appellees rely upon isolated testimony by a few witnesses. They point primarily to the testimony of Sheriff Tolman that before the withdrawal the police strength was increasing while the dissidents' strength and determination were waning, that there was "a very, very obvious psychological containment" as well as a "physical containment" that was "in place, effective, and growing" and that the withdrawal "created a climate for 'anything goes'" in which the dissidents "did what they wanted." In addition, the appellees cite the testimony of two other officers that before the withdrawal the police were "progressing" and that "the visible presence of law enforcement officers in the LEC area helped to contain the situation to that area." We find this evidence insufficient as a matter of law to establish causation.

None of the cited testimony even suggests the police would have been able to retake the LEC or otherwise prevent its burning in the short period between the police withdrawal and the igniting of the building. Nor is there any evidence, other than the conclusionary statements already noted, that the police presence was effective in containing the escalating insurrection. The police garage was burned to the ground at 10:30 a.m., despite the presence of police and establishment of checkpoints, and by 11:00 a.m. the crowd around the LEC had grown to about 100 people. Although Tolman described the checkpoints as "effective," he conceded that the containment "was leaky" and "could have been penetrated anywhere." JA 240–41. Other officers testified that armed Band members were in fact able to travel through the reservation, either avoiding the checkpoints or simply shooting their way through them, that the sound of gunfire was becoming more common and widespread and that the police were coming under increasingly frequent and threatening fire. Officers at checkpoints near the LEC were "pinned down" and "vulnerable" and forced to withdraw to "more defensible" positions. In short, the evidence conclusively demonstrates that, when Erwin

---

9. Any damages incurred before the police withdrawal, such as loss of the police garage, cannot be attributed to that event. *See* JA 134–35.

withdrew the police forces, the riot was beyond the power of the available officers to control so that their continued presence during the following three hours could not have prevented the appellees' injuries.[10] The only reasonable inference to be drawn therefore is that the withdrawal of police forces from the reservation was not the proximate cause of the damages suffered by the appellees.

For the preceding reasons, we conclude that the district court's findings of causation are clearly erroneous because they are unsupported by substantial evidence. We therefore reverse the district court's judgment and direct that judgment be entered in favor of the government.

It is so ordered.

---

10. In the August 5, 1988 order, the district court expressly stated:

The court finds that had the officers been left in place instead of being withdrawn, reinforcements from the Northwest Minnesota Law Enforcement Task Force could have been used to strengthen the containment and clear the area of any onlookers. Negotiations could also have begun. The reinforcements were beginning to arrive about the time the order to withdraw was given. (Stip. at Par. 40; Tolman Tr. at 63–64; Simondet Tr. at 496–497; McMullen Tr. at 574–575.)

JA 103. These findings are not, however, supported by the testimony cited. In fact, the testimony indicates that no substantial reinforcements were available until around 4:30 p.m. As for the possibility of negotiation, although the dissidents asked to speak with a specific reporter, it is not clear from the testimony whether they wished to negotiate with him or merely to make a statement. It is clear, however, that Erwin did not prevent negotiation between the reporter and the dissidents. In fact, around the time of the police withdrawal, the reporter, with Erwin's assistance, visited the LEC but found no one there with whom to speak.