Linda Wheeler TARPEH–DOE, Individually and As Mother and Next Friend of Nyenpan Tarpeh–Doe, II, et al., Appellees,

v.

UNITED STATES of America, et al., Appellants.

No. 92–5198.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 1, 1993.

Decided July 5, 1994.

Sally Rider, Asst. U.S. Atty., Washington, DC, argued the cause for the appellants. On brief were J. Ramsey Johnson, U.S. Atty. at the time the brief was filed, and John D. Bates, R. Craig Lawrence and Madelyn E. Johnson, Asst. U.S. Attys., Washington, DC.

Randell Hunt Norton, Washington, DC, argued the cause for the appellees. On brief were John Jude O'Donnell and Joseph Michael Hannon, Jr., Washington, DC.

Before MIKVA, Chief Judge; WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

Dissenting opinion filed by Chief Judge MIKVA.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Linda Wheeler Tarpeh–Doe (Linda) and Marilyn Wheeler, Linda's mother and the legal guardian of Linda's son, Nyenpan Tarpeh–Doe (Nyenpan), filed this action seeking damages against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b) and §§ 2671 *et seq.*, for the alleged negligent failure of Department of State personnel to supervise a staff doctor whose negligence allegedly caused Nyenpan irreversible neurological injury. Following a bench trial, the district court found in the plaintiffs' favor and awarded them damages of $4,659,-487.57. *See Tarpeh–Doe v. United States,* 771 F.Supp. 427 (D.D.C.1991) (establishing liability and awarding damages of $901,-162.71); Order and Memorandum, C.A. No. 88–0270 (filed Mar. 20, 1992) (increasing damage award to current amount). The United States appeals the court's finding of liability. Because we find no evidence that the Department of State breached a supervisory duty that caused the appellees' injuries, we reverse the district court's decision.

## I.

The district court's findings reveal the following material facts, supported by the evidence and largely undisputed.

In 1980 Linda, a certified public accountant, was hired as an accountant by the United States Agency for International Development (AID) and shortly thereafter was assigned to Monrovia, Liberia. She arrived in Monrovia on May 26, 1981, and almost immediately met and became romantically involved with Nyenpan "Ben" Tarpeh–Doe (Ben), an employee of the Liberian Ministry of Justice. In September 1981, Ben and Linda visited the United States Embassy health unit twice so that Ben could undergo various medical tests required before their planned marriage. On one visit, Linda mentioned to Dr. Theodore E. Lefton, the Regional Medical Officer assigned to the Embassy in Monrovia, that she was pregnant, a fact she had learned earlier in the month from a test administered by Dr. Kassas, a local physician whom Ben had recommended. Throughout her pregnancy Linda received regular prenatal care from Dr. Johnson, a local obstetrician and gynecologist, to whom either Dr. Lefton or Billie Clement, the Embassy nurse, had referred her for a gynecological problem the previous July. At no time during her pregnancy did Linda seek or receive care from Dr. Lefton.

On January 16, 1982 Ben and Linda were married and on May 18, 1982 Linda gave birth to Nyenpan in a local clinic, with Dr. Johnson present. After she was released from the clinic, Linda continued to see Dr. Johnson who examined both Linda and Nyenpan on May 25 and again on June 2. On each occasion he found them both in good health. Nevertheless, Linda fell ill the evening of June 2. When she showed no improvement by the following evening, Thursday, June 3, a friend called the Embassy health unit and requested medical assistance. Dr. Lefton was unavailable and Linda was visited instead by Dr. Feir, the Embassy psychiatrist, accompanied by Clement, the Embassy nurse. Dr. Feir gave Linda an examination and recommended she seek care that night from Dr. Johnson and visit Dr. Lefton at the Embassy the following morning. According to Linda's friend, Clement commented at the time that "she didn't think the baby looked right." *Id.* at 436. Dr. Johnson visited Linda at 1:00 a.m. Friday morning and treated her for malaria, staph infection and mastitis. When Linda visited

the Embassy health unit later that morning, Dr. Lefton administered ampicillin for mastitis and told her she could resume breastfeeding Nyenpan. It is unclear whether Nyenpan accompanied her to the Embassy.

Later that day, when Nyenpan became lethargic and refused feeding, Linda and Ben took him to the clinic where he had been born and a local physician treated him with ampicillin. When Nyenpan showed no improvement three hours later, his parents took him to the emergency room at a private hospital where two local doctors treated him with an electrolyte solution for dehydration. At 9:00 a.m. the next morning, when Linda attempted to awaken Nyenpan for his feeding, he " 'became rigid' in her arms for one to two seconds," 771 F.Supp. at 436, and the Tarpeh–Does decided to take him to see Dr. Johnson. On the way, however, they encountered Clement who persuaded them to visit the Embassy health unit instead. En route Nyenpan once again became briefly rigid.

When the Tarpeh–Does arrived at the Embassy, Dr. Lefton examined Nyenpan almost immediately and administered gentamicin and procaine, both antibiotics. He told Nyenpan's parents the child could be evacuated from Liberia on an 11:00 p.m. flight that evening. Dr. Lefton then sent for Dr. Van Reken, an American pediatrician unaffiliated with the Embassy. Dr. Van Reken responded immediately, arriving at the Embassy about 11:30 a.m. The two physicians examined Nyenpan and agreed that he had spinal meningitis. Upon Dr. Van Reken's assurance that he could "make the baby well," Dr. Lefton decided not to permit evacuation but instead to transfer Nyenpan's care to Dr. Van Reken. Dr. Van Reken proposed admitting Nyenpan to John F. Kennedy Hospital (JFK) in Monrovia, a facility with conditions Ben had heard were "appalling." Nevertheless, "[o]ver the parents' objections, and with the knowledge and concurrence of Dr. Lefton," Nyenpan was taken to JFK at around noon, accompanied by Dr. Van Reken, Clement, Linda and Ben. When, after a lengthy delay, Nyenpan was finally placed in a room at about 1:30 p.m., Dr. Van Reken and Clement left the hospital and Ben, following Dr. Van Reken's instructions, visited a local

pharmacy to purchase certain prescription drugs unavailable at JFK. Dr. Van Reken returned at about 4:00 p.m. and left instructions for Nyenpan's overnight care. Linda, along with several friends, including Dr. Witten, a physician whose husband was affiliated with AID, stayed overnight in Nyenpan's room where they observed both rats and cockroaches moving about. Nyenpan, who was not visited by a hospital doctor from 9:00 p.m. until 6:30 a.m, developed a fever during the night and suffered additional seizures. Dr. Witten recommended giving him oxygen but upon inquiry the group was informed that the hospital's only oxygen unit was already in use and that the Embassy had none of its own. Dr. Witten then administered valium to treat Nyenpan's seizures.

Dr. Van Reken returned to JFK late the next morning and reluctantly agreed at the Tarpeh–Does' insistence to transfer Nyenpan to another hospital. That afternoon Nyenpan was moved to ELWA Hospital, a more sanitary and better run facility, and arrangements were made for a private nurse to attend him through the night. The district court found, however, that "it is more likely than not likely that Nyenpan was beyond hope of recovery at least by the time or shortly after his transfer to ELWA." 771 F.Supp. at 441. When Nyenpan's condition showed no improvement over the next few days, Dr. Van Reken agreed to have him evacuated. The evacuation was finally authorized on June 17, 1982, and the Tarpeh–Does then flew to Colorado where Nyenpan was treated, without improvement, for two weeks at the University of Colorado hospital. After his release, Nyenpan lived with his mother for over a year until she was again assigned overseas duty. Because Nyenpan was unable to accompany her, the family had him admitted to the Wheat Ridge Regional Center in Colorado and Linda's mother was appointed his guardian. The trial court found that Nyenpan will have to remain at Wheat Ridge "for the foreseeable future" and, based on a doctor's deposition testimony, characterized Nyenpan's condition at the time as follows:

> [H]e receives extensive care. He has no independent skills.... He has no functional control over his arms and legs,

though he can move them.... He is blind. He continues to have ten to twelve seizures a year.... Care providers feed and dress him.... They also turn him every hour or two to prevent skin breakdown.... In addition, they sometimes give him baths or massages, read him stories, or take him outside in a wheelchair.... He does not communicate in any meaningful way but responds positively to the care providers who are familiar to him.

771 F.Supp. at 439 (record citations omitted).

On January 31, 1984, the appellees filed an administrative claim with the Department of State, alleging negligence by government officials in both Liberia and the United States. The State Department denied the claim and the appellees then filed this action under the Federal Tort Claims Act against the United States and the Secretary of State, alleging negligence by State Department officials in Washington, D.C.[1] As noted above, the district court found in the appellees' favor and awarded them damages of $4,659,487.57. The appellants challenge that award on two grounds: (1) the Government is immune from liability under the "discretionary function" and the "foreign country" exceptions to the FTCA[2] and (2) the appellees failed to establish, and the district court to find, any breach of a duty that caused their damages. We conclude the district court's judgment must be reversed on the second ground and, accordingly, do not address the first.

## II.

 Tort liability under the FTCA is determined according to the law of the state where the alleged acts or omissions occurred. *Kugel v. United States*, 947 F.2d 1504, 1508 (D.C.Cir.1991) (citing 28 U.S.C. § 1346(b)); *Red Lake Band of Chippewa Indians v. United States*, 936 F.2d 1320, 1325 (D.C.Cir. 1991). Thus, as the parties here agree, whether the government can be held liable

for the appellees' injuries must be resolved under District of Columbia tort law. The appellees prevailed below under a theory of negligent supervision, asserting that State Department officials were aware that Dr. Lefton was not properly attending to his duties and should therefore have supervised him more closely to ensure he was available to treat Nyenpan. The District of Columbia recognizes the tort of negligent supervision as formulated in the Second Restatement of Agency:

A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:

(a) in giving improper or ambiguous orders or in failing to make proper regulations; or

(b) in the employment of improper persons or instrumentalities in work involving risk or harm to others;

(c) in the supervision of the activity; or

(d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

Restatement (Second) of Agency § 213 (1957), *quoted in Murphy v. Army Distaff Found., Inc.*, 458 A.2d 61, 64 (D.C.1983); *see also International Distrib. Corp. v. American Dist. Tel. Co.*, 569 F.2d 136, 139 (D.C.Cir.1977) (applying District of Columbia law and citing § 213 as authority for tort of negligent supervision). Of course, as in any negligence action, a plaintiff seeking to establish negligent supervision "bears the burden of presenting evidence 'which establishes the applicable standard of care, demonstrates that this standard has been violated, and develops a causal relationship between the violation and the harm complained of.'" *Morrison v. MacNamara*, 407 A.2d 555, 560 (D.C.1979) (quoting *Kosberg v. Washington*

---

1. The appellees were precluded from suing for negligent acts or omissions occurring in Liberia because of the FTCA's "foreign country" exception. *See infra* note 2 & accompanying text.

2. These exceptions bar recovery, respectively, for "[a]ny claim ... based upon the exercise or

performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused," 28 U.S.C. § 2680(a), or "[a]ny claim arising in a foreign country," *id.* § 2680(k).

*Hosp. Center, Inc.*, 394 F.2d 947, 949 (D.C.Cir.1968)). We conclude the appellees here did not sustain their burden of demonstrating the requisite causal relationship between any breach of duty by the State Department and the appellees' injuries. As the district court recognized, the appellees were required to establish, at a minimum, that the alleged inadequate supervision of Dr. Lefton was a "substantial factor" in causing Nyenpan's irreversible condition. *See Daniels v. Hadley Memorial Hosp.*, 566 F.2d 749, 757 (D.C.Cir.1977) ("[T]he plaintiff must show that the defendant's deviation from the standard of care was a 'substantial factor' in bringing about the harm complained of."); *see also Lacy v. District of Columbia*, 424 A.2d 317, 319–21 (D.C.1980) ("The substantial factor test . . . is part of the District's law of negligence."). This they failed to do.

■ The district court found, and the record supports, that State Department officials were on notice that Dr. Lefton's "attitude" and "availability" enjoyed a poor reputation among other United States citizens in Monrovia. Most tellingly, a State Department team that inspected the Embassy in February and March 1982 reported "widespread discontent with Dr. Lefton's performance" and "dissatisfaction with Dr. Lefton's attitude and availability." The team characterized "the magnitude and intensity of the complaints" as "unprecedented in their experience" and specifically cited Dr. Lefton's "insensitivity, aloofness, lack of sympathy, lack of . . . bedside manner, and also frequent unavailability." Thus, the Department may well, as the district court found, have been under a duty to take steps to improve Dr. Lefton's availability and attitude. The Department may also have breached that duty. There is no evidence, however, that such a breach was a substantial factor causing Nyenpan's current condition or the injuries flowing therefrom. Accordingly, we conclude the district court's findings on causation were clearly erroneous under rule 52(a) of the Federal Rules of Civil Procedure and must therefore be reversed. *See Red Lake Band of Chippewa Indians v. United States*, 936 F.2d 1320, 1324–25 (D.C.Cir.1991).

■ The district court concluded that "Dr. Lefton's negligent actions and omissions proximately caused Nyenpan's injuries," 771 F.Supp. at 452, and that the Washington defendants should be held liable for having " '[permitted] or [failed] to prevent negligence or other tortious conduct by persons . . . under [their] control,' " namely Dr. Lefton, *id.* at 454 (quoting Restatement (Second) of Agency § 213). Nevertheless, the court assigned no precise cause to Nyenpan's deterioration and identified no single State Department omission that more likely than not permitted such a cause to occur. In fact, the court affirmatively acknowledged that it is "difficult to determine with any degree of certainty the true cause of the infant's failure to recover." 771 F.Supp. at 427.[3] It is nevertheless clear from the record that the appellees attempted at trial to attribute Nyenpan's deterioration to misdiagnosis and mistreatment by Drs. Lefton and Van Reken. The appellees' experts testified that the two doctors incorrectly treated Nyenpan with antibiotics appropriate for Gram positive meningitis when in fact Nyenpan suffered from

3. The court made this concession while asserting that "D.C. courts have established that where a defendant's acts or omissions create uncertainty as to whether, had the defendant acted otherwise, the outcome would have been more favorable to the plaintiff, that uncertainty does not provide a defense against the plaintiff's showing of proximate cause." 771 F.Supp. at 453. It is true that when, as is often the case in medical malpractice actions, a defendant's negligent act or omission makes it more difficult to determine what the medical outcome would have been but for that negligence, the plaintiff's burden of demonstrating a favorable outcome may be lightened. *See Daniels v. Hadley Memorial Hosp.*, 566 F.2d 749, 757 (D.C.Cir.1977); *Ascher v. Gutierrez*, 533 F.2d 1235, 1238 (D.C.Cir.1976). In such a case, however, the plaintiff's burden of first establishing a negligent act or omission that could have caused an unfavorable outcome remains unchanged. In *Daniels*, for example, the plaintiff presented competent medical testimony that the plaintiff's condition "could have been medically corrected" had the emergency medical team acted within three minutes. 566 F.2d at 758. Numerous medical personnel testified about the importance of respiration therapy, particularly in averting immediate patient deterioration. Here, no medical expert identified what specific actions could have been taken in the June 3–5 period to avert Nyenpan's deterioration. The district judge, while deserving of deference to sound legal judgments based on the evidence, cannot sit as a medical expert to fill the gap.

Gram negative meningitis. *See* 771 F.Supp. at 439–40.[4] Even if this testimony supports a finding of negligence by the two physicians, such medical negligence would not have resulted from any breach of duty by State Department officials in Washington. Those officials were on notice only of Dr. Lefton's poor "availability" and "attitude"; they had no reason to question his medical competence.[5] They were therefore under no special duty to supervise Dr. Lefton's medical decisions or treatment.

By the same token, there is no evidence that, had the Department taken steps to ensure Dr. Lefton's availability or improve his attitude, as the district court found them bound to do, Nyenpan's medical treatment or condition would have been any different. The district court concluded the "[d]efendants could and should have directed Dr. Lefton to focus more attention on his responsibilities and to make himself available in the evenings and on weekends," 771 F.Supp. at 453, and identified four periods in which Lefton was not available to treat, or inattentive to, Linda or the child: (1) throughout Linda's pregnancy when she was under the exclusive care of Dr. Johnson, with no follow-up by Lefton himself—the court's assumption being that had Lefton been more attentive during this time Linda would have been more likely to consult him sooner, perhaps when she first fell ill on June 2, and obtain preventative advice that might have benefitted Nyenpan; (2) the evening of June 3 when Linda was attended by Dr. Feir, the Embassy psychiatrist, because Lefton was not available, and Clement observed she didn't think Nyenpan

"looked right"; (3) the morning of June 4, when Lefton actually treated Linda and failed to inquire after or examine Nyenpan; and (4) the period June 5–6 when Nyenpan was left entirely in Van Reken's care with no inquiry from Lefton. The record contains no competent evidence, however, that any of the alleged inattentiveness caused Nyenpan's condition or that greater vigilance during these times would have altered the ultimate result. There is no expert evidence that any preventative advice offered on June 2 or 3 might have averted the onset of meningitis altogether. The district court suggested that breastfeeding "might have caused or increased the child's exposure to infectious bacteria," but there is no expert evidence that breastfeeding was or might have been the cause of Nyenpan's condition and, in any event, Linda ceased breastfeeding while she was ill. *Id.* at 436.[6] Nor is there any evidence that, had Lefton been available on June 3, he could then have diagnosed, or more importantly *correctly* diagnosed, Nyenpan's condition or that earlier diagnosis would have prompted him to pursue a different course of treatment or would have slowed Nyenpan's deterioration. Finally, there is no competent evidence that the substandard conditions at JFK, namely the infestation, medical inattention and lack of oxygen, worsened Nyenpan's condition.

In short, even if Nyenpan's current condition may have been caused in part by Dr. Lefton's negligence, it was not the result of any failure by State Department officials to more closely supervise Dr. Lefton's availability or attitude.[7] Under the facts here, Dr.

---

**4.** Both are forms of bacterial spinal meningitis, but the two are caused by different bacteria, Gram positive by staph or strep and Gram negative by salmonella, and treated with different antibiotics. *See* 771 F.Supp. at 439–40.

**5.** The Department's inspection team reported no complaints about his medical expertise and in fact its leader "emphasized that the team was not qualified to evaluate Dr. Lefton's medical competence from a technical standpoint." 771 F.Supp. at 432. In addition, the then Medical Director of the State Department's Office of Medical Services stated he "knew Dr. Lefton as a 'bright young physician who was astute and competent'" and "had 'admired his acumen" in annual medical meetings.'" *Id.* at 434 (record citations omitted).

**6.** In addition, when Lefton did treat Linda on June 4, he advised her to resume breastfeeding, *id.* at 436—there is no reason to believe he would have recommended the contrary one or two days earlier.

**7.** While it is conceivable that immediate evacuation on June 5 might have altered the outcome, it is sheer speculation that Dr. Lefton's decision not to evacuate in any way resulted from the State Department's failure to monitor more closely his availability or attitude. Dr. Lefton in fact was present and treating Nyenpan when he made that decision and cited specific medical reasons for it. *See id.* at 441 ("Dr. Lefton stated that he did not want to evacuate the baby because of the risk of lack of oxygen on the plane while the baby

Lefton's negligence, if any, was medical in nature and as such not preventible by any supervisory measures the Washington officials may have been under a duty to take.[8] Accordingly, the government cannot be held liable for negligent supervision.

For the preceding reasons, the judgment of the district court is

*Reversed.*

MIKVA, Chief Judge, dissenting:

Trial Judge Oberdorfer found that State Department omissions proximately caused Nyenpan Tarpeh–Doe's illness. To overturn that finding under a "clearly erroneous" standard of review, the majority must conclude that the finding was not based on a "plausible account" of the evidence viewed in its entirety. *See Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1984). The majority cannot reach such a result on this record. I dissent.

## I.

The trial court's conclusion that State Department omissions were a "substantial factor" in causing Nyenpan Tarpeh–Doe's injuries is a finding of fact; it must be upheld unless it is "clearly erroneous." *See, e.g., Daniels v. Hadley Memorial Hospital,* 566 F.2d 749, 756 (D.C.Cir.1977). This is a highly deferential standard. "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the *definite and firm* conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) (emphasis added). "In applying the clearly erroneous standard to the findings of a trial court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo.*" *Zenith Radio Corp.*

*v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Judge Oberdorfer found that State Department omissions were a substantial factor in causing Nyenpan's illness and/or impeding his recovery. Because that finding was based on a "plausible account" of the evidence viewed in its entirety, it should be upheld.

## II.

In reaching the opposite conclusion, the majority understates Dr. Lefton's negligence and misconstrues the trial court's findings as to its likely effect on Nyenpan's condition. A recitation of those findings and their evidentiary basis is thus in order:

Dr. Lefton's negligent action and omissions proximately caused Nyenpan's injuries. Dr. Lefton did not administer or in any way supervise or check on any gynecological, prenatal, or obstetrical care to Linda Wheeler Tarpeh–Doe despite her manifest need for such care. Instead, he referred her to a local gynecologist and obstetrician for care for a period of over nine months without advising her that she should or could call him if she needed advice, without arranging to see her even once to determine whether she was receiving adequate local care, and without inquiring about her care of her treating physicians. He did not inform her of the known risks of delivery and post-natal care of a child, particularly a first child, in disease-ridden Monrovia. He never alerted her to the conditions of the various clinics and

---

was having a seizure.... He clarified that intubation (insertion of a tracheal tube) during a seizure would be more difficult in a plane.") (record citations omitted).

8. Thus, even had the Department "imposed additional reporting requirements" such as that Lefton "report any serious illness immediately by

telephone or telegram," as the district court suggested it should have done, *see* 771 F.Supp. at 453–54, there is no reason to suppose such a policy would have ensured closer medical supervision by Lefton here or, if it did, that his medical diagnosis and treatment, or the consequences thereof, would have been any different.

hospitals in Monrovia, some of which were evidently notorious. He did not visit her upon or after her delivery. When she became sick on Thursday, June 3, and needed prompt attention at 10:00 p.m. he was unavailable for unexplained reasons— the likely inference being that he refused to make a housecall as he had refused several times in the past. When Tarpeh– Doe visited Dr. Lefton for treatment for mastitis on Friday, June 4, Dr. Lefton did not examine, or even ask about the child. He advised her at that time to resume breast feeding. That advice, if followed, could have caused or increased the child's exposure to infectious bacteria. When the Tarpeh–Does came to Dr. Lefton on June 5, he did not administer any tests. Dr. Lefton considered, but decided against, attempting to evacuate the child by commercial airplane. He did not request the services of a MAC flight for evacuation. He handed over all care to Dr. Van Reken, a physician to whom he had never referred a patient before. He permitted Dr. Van Reken to admit Nyenpan into a local hospital with deplorable conditions at a critical point in the baby's care—against the baby's parents' vehement objections. He was not familiar with conditions at JFK, despite his duty to be aware of conditions at local health facilities in order to advise State Department and AID employees where to safely obtain services. He did not visit or inquire about his American charges at JFK hospital during the initial afternoon of June 5, nor did he visit or inquire that night or the next morning. He never evaluated its facilities for himself to determine whether the parents' pronounced fears were justified. He did not check to see whether medications, or oxygen, or 24–hour care by doctors or other trained medical attendants, would be available there. He did not contact the Office of Medical Services immediately to request advice or support from a neonatologist or an expert in bacterial spinal meningitis in the United States. When he did cable the Office, he did not inform persons there that he had not examined the child since June 5 nor that he had turned over care to Dr. Van Reken, nor did he request assistance or advice. He did not visit Tarpeh– Doe until June 12. After the June 5 visit to him at the Embassy health clinic, he did not examine the baby at all. He did not authorize evacuation either upon the parents' repeated requests or upon Dr. Van Reken's approval of evacuation.

In short, Dr. Lefton washed his hands of Linda Tarpeh–Doe and her baby and turned his back on them, doing as little as possible to attend to Tarpeh–Doe's care during pregnancy or to plan for the close medical supervision of mother and child after delivery. He was supposed to be the family doctor. Had Dr. Lefton provided Tarpeh–Doe with gynecological or prenatal care or taken any interest at all in her condition by anticipating and preparing himself and herself for the risks awaiting the mother and child after delivery, he would have visited her or otherwise made himself available so that she would have automatically called or visited him with the child on Friday, or even Thursday, when she first noticed signs of illness. Had she felt that he would willingly, as opposed to reluctantly, attend to her medical needs, she would have sought him out instead of waiting until Nyenpan required emergency care and seeking that care from local, inadequate, facilities. On June 5, had Billie Clement not directed the Tarpeh–Does to the embassy health unit, it is even possible that Nyenpan would have received better care from Dr. Johnson at Cooper's clinic than he received from Dr. Lefton who permitted Dr. Van Reken to place him in a hospital with roaches and rats and with no medications, no medical attendants during the night, and no oxygen. From Tarpeh– Doe's arrival in Monrovia throughout her pregnancy, delivery, and most important, from the onset of the post-natal illness of mother and child, Dr. Lefton took none of the initiatives required of him by the State Department directives or by any conceivable standard of care for a physician in his circumstances.

*Wheeler Tarpeh–Doe v. United States,* 771 F.Supp. 427, 452–53 (D.D.C.1991).

As the foregoing passage makes clear, Judge Oberdorfer based his negligence find-

ing on an array of actions and omissions, particularly Dr. Lefton's lack of interest in and attention to Linda and Nyenpan throughout her pregnancy and at several critical times during the baby's illness. Yet, the majority treats any negligence on the part of Dr. Lefton as resulting primarily from misdiagnosis or affirmative mistreatment. As a result, the majority concludes that "Dr. Lefton's negligence, if any, was . . . not preventible by" State Department officials because the State Department was aware only of Dr. Lefton's poor attitude and penchant for unavailability, not any deficiency in his medical capabilities. Maj. Opin. at 125–26. Properly viewed, however, Dr. Lefton's primary negligence was his almost total abdication of responsibility for Linda and Nyenpan. The consequences of that negligence were surely foreseeable to Washington officials in face of the "unprecedented magnitude" of complaints revealing "widespread discontent with Dr. Lefton's performance [and] dissatisfaction with Dr. Lefton's attitude and availability." And, as discussed below, those consequences may well have been preventible.

Even if Dr. Lefton's negligence could be characterized as strictly medical, I disagree that the State Department had no duty whatsoever to monitor his medical decisions, particular in emergency cases. First, as the majority indicates, the State Department's review of Dr. Lefton's previous activities reported widespread dissatisfaction with his "performance" in general, which reasonably could be taken to include his medical decisions. More importantly, a doctor's unavailability and poor attitude almost necessarily affect both the level and quality of treatment his patients receive. If a doctor is unavailable to give treatment, it is irrelevant how competent that treatment may have been. And, if a patient has lost confidence in her primary doctor because of his habitual bad attitude, it is foreseeable that she will choose not even to seek treatment or to seek it from less competent sources. The potential consequences of such a crisis of confidence might not be altogether clear were this the ordinary tort action arising in this country. It could be assumed in such a case that the patient would receive quality care elsewhere.

In this case, however, the State Department touts its medical services as an inducement for employees to accept employment in isolated and medically substandard outposts around the world. See 771 F.Supp. at 430. As such, State Department medical officials have a heightened duty to foresee the obvious and dire consequences of their doctors' negligence in places like Liberia. Discharging that duty here involved more that making sure Dr. Lefton was available when Linda Tarpeh–Doe happened to call; it also required Department officials to monitor his continued availability and effectiveness, which necessarily includes some oversight of his medical decisions. In short, State Department officials should have foreseen that Dr. Lefton's deficiencies were likely to result in the type of illness that befell Nyenpan, and they had a corresponding duty to do whatever was reasonably within their power to prevent that illness. In any event, that is what the trial judge found.

### III.

With Dr. Lefton's negligence and its foreseeability to State Department officials in clearer focus, I fail to see how the trial court's causation finding is "clearly erroneous" given the deference that the standard affords the finder of fact. Judge Oberdorfer identified four remedial actions that the State Department failed to take that might have prevented or ameliorated Nyenpan's illness: (1) "direct[ing] Dr. Lefton to focus more attention on his responsibilities and to make himself more available" after hours; (2) imposing additional reporting requirements on Dr. Lefton so that State Department officials could monitor emergency situations; (3) warning the Ambassador and other embassy medical personnel to notify Washington should emergency treatment situations arise; and (4) requiring Dr. Lefton to adopt plans addressing the care of pregnant mothers and their children, a particularly vulnerable class of patients. 771 F.Supp. at 453–54.

Each of these precautions would have been a reasonable response upon learning that Dr. Lefton was inclined to neglect his patients, and under a plausible account of the facts,

each could have averted Dr. Lefton's negligence and changed the course of Nyenpan's illness. In particular, it is reasonable to infer that had the State Department warned Dr. Lefton to be more attentive, he would have visited mother and child on the night of June 3 when Linda Tarpeh–Doe first sought treatment for her own illness. Had he made that housecall and observed the baby—who Nurse Clement said did not "look right"—an attentive Dr. Lefton would have begun the diagnosis process then, on the first rather than third day of the critical period between June 3 and June 6. Even if Dr. Lefton did not see the baby on June 3, it is surely reasonable to assume that Linda Tarpeh–Doe would have had enough confidence in a duly warned and attentive Dr. Lefton to call upon him on June 4, instead of proceeding to a local clinic, when the baby stopped feeding. Under this scenario, the diagnosis and treatment would have begun one day earlier than it actually did.

Assuming it had occurred, earlier care by a conscientious doctor would have increased the likelihood of proper diagnosis and treatment during the critical June 3–6 period. First, Nyenpan's doctors would have had more time to identify the type of bacteria that caused Nyenpan's meningitis. As it was, the doctors tested the baby only for Gram-positive bacteria (staph and strep) during the critical period. 771 F.Supp. at 439. Tests for Gram-negative salmonella, which two experts identified as the cause of the meningitis, were not performed until well after Nyenpan's condition was beyond hope. *Id.* at 440.

Earlier care also would have revealed the urgency of Nyenpan's condition at a time when State Department intervention could have improved the baby's chances. Had Dr. Lefton or other embassy personnel been required to report emergency situations, and had they actually done so, stateside experts could have assisted Dr. Lefton in making a proper diagnosis. For example, they could have alerted Dr. Lefton of the possibility of Gram-negative infection and recommended a course of treatment. Or, they could have directed Dr. Lefton to forward Nyenpan's fluid samples for a full battery of tests in the States. Or, they could have intervened in the decision whether to airlift Nyenpan when the seriousness of his illness first became apparent. On this score, I find severely lacking Dr. Lefton's justification for not evacuating Nyenpan—namely, that lack of oxygen on the plane would have made intubation more difficult. The hospital to which the baby was assigned had a total absence of oxygen available, a fact Dr. Lefton was under a duty to know. The lack of oxygen at the JFK hospital leaves Dr. Lefton no valid reason for preventing prompt evacuation. In any event, the State Department should have known that prompt evacuation from Monrovia might be needed in emergency situations, and it should have provided for safe and effective means to carry it out.

## IV.

Admittedly, the causal link between State Department omissions and Nyenpan's illness is somewhat attenuated: because the exact cause of Nyenpan's injury is impossible to pinpoint, the effect of the State Department's inattention to Dr. Lefton's documented deficiencies is likewise difficult to gauge. But as the majority acknowledges, a plaintiff's burden on causation is lightened when a doctor's (or his supervisor's) negligent omissions make it difficult to determine whether the injury would have occurred but for those omissions. In such cases, plaintiffs may prevail so long as the defendant's inaction creates uncertainty as to whether, had the defendant acted otherwise, the injury would have been averted. *See, e.g., Daniels v. Hadley Memorial Hospital,* 566 F.2d 749, 757 (D.C.Cir.1977). Judge Oberdorfer found that Dr. Lefton's almost total abdication of responsibility for mother and child was a substantial factor in causing Nyenpan's illness and/or lack of recovery. Because that negligence was reasonably foreseeable to State Department medical officials, and because a number of reasonable remedial actions could have been taken in an effort to avert the injury, it cannot be clearly erroneous to conclude that the State Department's inaction created the requisite uncertainty as to whether Nyenpan would have recovered had the State Department acted otherwise.

**130**

Indeed, the speculative nature of the causation question makes it even more troubling that the majority overturns the findings of a trial judge under a clear error standard. Whether an omission creates enough uncertainty as to its effect on a patient's condition to impose tort liability is a largely subjective inquiry. Under the clearly erroneous standard, the question before an appellate judge is not whether he or she would have reached the opposite subjective conclusion. Rather, the question is whether the trial judge's conclusion is based on a plausible account of the evidence. A finding in favor of the plaintiff should thus be overturned only if the appellate judge can say with confidence that the defendant's omission was of *no* or *minimal* consequence on the plaintiff's condition. By failing to act, the State Department deprived Nyenpan of quality care during the period in which he had a fighting chance of recovery. While no one can be sure that he would have recovered, neither is it certain that he would not have. I would let the trial judge perform the role that precedent has assigned him, and would affirm the trial court's decision.